Next case is case number 419-0171. The people of the state of Illinois v. Donald Whalen. We'll show the appellant present by counsel, Ms. Brooks. And is Mr. Slosser present? Yes. Okay, counsel, why don't you have a seat at the table, if you would, please? Thank you. And did you want to note the presence of another attorney, or? Yes, sir. With me is Ms. Mary Thompson and a number of our teams and our clients. All right. Thank you. You may proceed. Thank you, Your Honors. Good afternoon. May I please have the court? My name is Allison Paige Brooks, and I'm here on behalf of the people of the state of Illinois. Section 2-1401 is a mechanism to correct errors of fact that would have prevented the entry of judgment. And it has an important exception, the statute of limitations, which is the purpose of that is to preserve the state's interest in the finality of judgment. And in this case, a murder that was committed in 1991 is now being litigated, and a new trial has been ordered by the trial court, priming the state of its interest in the finality of judgment. And the mechanism for that, in this case, was Section 2-1401, subsection C, which was added in order to permit a defendant who has obtained post-mission DNA testing to produce evidence of actual innocence, and avoiding the requirement of prosecutors to essentially confess a legal fiction of constructive fraud and permit them to get relief when they have shown that, for example, as one of the legislative debates showed, a sexual assault victim had misidentified their attacker, but yet DNA evidence had established who the real offender was, and the point was to get that person relief. And that is the mechanism by which these factual limitations could be avoided. However, in this case, the trial court erroneously denied the state's motions to dismiss the time-barred claim related to the palm prints because they failed to show fraudulent concealment. Fraudulent concealment is more than just a mere omission of the offender to disclose something in discovery. And even if they had shown fraudulent concealment, by the time they got the phone calls involving the fingerprints in their deer pure, in 2007, they would have had only two years out for that, to file their petition. So the statute of limitations did not comply with, and that claim should have been dismissed and not made part of a true hearing. So going forward, they would have had to show that the DNA testing alone constituted conclusive evidence of actual innocence sufficient to grant a new trial. But instead, the trial court commingled the print evidence with the DNA test result in order to do the trial. Another reason why the trial court reached the wrong result is by the standard that the judge applied. And the judge applied the standard by saying that it was more likely not to have affected the jury's determination, and then further found the likelihood of a different result to be great enough to undermine the confidence in the outcome of the original trial. And the state decided this court's decision in Davis, which had actually lowered the standard that applies to newly discovered evidence cases to be equivalent to the Strickland standard. However, Strickland itself had issued the high standard applicable to newly discovered evidence claims, and established the lower materiality standard under Brady as being the appropriate standard when a defendant claims ineffective. But what about the Supreme Court of Illinois' citation of Davis as, apparently, I shouldn't say, citing it, approving it? As to this proposition or a different proposition? This proposition. In which case was that run? I'm trying to remember the names. I always am distracted by names. Coleman? Coleman. Where they seem to be talking about, they cited Davis with approving language. Well, the part of Davis that specifically talks about how it's not necessary to show it's more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence, well that part has been specifically disavowed, albeit not referring to Davis in the Edwards case that came later in 2012. So at least that part of it has been implicitly overruled. So the standard has to be that the evidence is so conclusive that it would probably change the result if a new trial is granted. And then when the district court in Davis said that, well, probably change the result means the same thing as the lack of confidence in the outcome, undermining confidence in the outcome, which is the Strickland standard. However, Strickland itself showed that the standard for newly discovered evidence is much higher. And that is also cited in our Nebraska case. We showed how the reason why the standards are different is because the absence of assurances that the result is reliable, there is no assurances when the defendant has had important rights violated, like the right to effectively submit to counsel. But when the claim instead is merely that despite all the assurances that the result is reliable, the defendant is trying to produce newly discovered evidence of actual innocence, however, that there's a presumption the result is reliable. And therefore, the defendant is called to a much higher standard. And the whole point of that is to preserve the state's interest in the finality of judgment. So that's why it seems like the trial court was confused as to the proper standard. And that's understandable given this court's decision in Davis and the fact that in Edwards, when the court finally clarified what it means to probably change the result as being that it's evidence, it has to be more likely than not that no reasonable juror would have convicted the defendant. But yet, when I look at the trial court's ruling, I can't see a court ever held which set it to that standard when ordering a new trial. And so this court would have the option either to step back from the consideration and apply the proper standard, particularly also with respect to the time-barred claim, to not consider the evidence of the time-barred claim in conjunction with that. But still, notwithstanding the failure to dismiss the time-barred claim and notwithstanding the trial court's apparent application of the correct standard, this court should simply reverse the grant of the new trial outright for the reasons that it's obvious in this record that the defendant failed, utterly failed, to meet their burden that would be required to grant a new trial on a claim of newly discovered evidence. Mr. Brooks, if I understand your argument correctly, you are saying that this court in Davis defined the phrase, quote, probably changed the result, end quote. And my question then, because I agree with that, you're shaking your head, you do agree with what I just suggested, has the Supreme Court ever adopted the language from Davis where this court purportedly defined probably changed the result for something other than the plain and ordinary meaning which would commonly be given to those words? My question is, other than this court, has the Supreme Court ever said that probably changed the result means something other than what the plain and ordinary meaning of the phrase would be? Well, not other than the plain and ordinary meaning. They explained that the plain and ordinary meaning is that, if I can find the, the Edwards case 2012, they equated probably changed the result meaning more likely than not, it's probable, plain meaning is more likely than not, but changed the result meaning that no reasonable juror would have convicted the defendant. Yeah, so what I'm getting at is it appears this court in Davis attached a different meaning to that phrase than what the Supreme Court has said. That appears to me to be the case, and it sounds like you agree with that. This court's decision in Davis preceded Edwards had equated this with Strickland prejudice. Right. Which means that there's a reasonable probability, not necessarily a more likely than not. In fact, I think this court in Davis said it need not be more likely than not, that there would be a reasonable doubt of guilt. A reasonable probability the jury would have found a reasonable doubt of guilt. That is different than no reasonable juror, more likely than not, that no reasonable juror would have convicted the defendant. So we're not talking, and this is actual instance land, we're not talking about whether the jurors would have had a reasonable doubt or not. We're saying it has to be more likely than not that no reasonable juror would have convicted the defendant. Right, and I notice you also cited People v. Sanders. That's a more recent Supreme Court case. Yes. And that case cited Edwards, not Davis. Is that correct? That is at least my reading. I believe so, but I'm not 100% sure of that. I believe you cited it in your reading. Anyway, if I'm reading Sanders correctly, at least three times in that opinion, the Supreme Court could have adopted the language from Davis, but didn't do so, but stuck with the language, it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new sentence, and then they cite Edwards and we're teased. Correct. Okay. All right. And on your first issue, since I just mentioned we're teased, I want to come back to that. You seem to suggest in your brief that we're teased would stand for the proposition that had petitioner going forward in 2009 with the evidence about the telephone logs and lost. This is a hypothetical, obviously, because they didn't proceed on it. Right. But that res judicata would not have prohibited the defendant coming forward now later with a subsequent 2-1401 in arguing both the newfound DNA evidence, along with the prior, at that time, new evidence regarding the phone logs. Am I reading your brief correctly? Only if the defendant had shown fraudulent concealment, which the state does not believe that he did, but if they had shown fraudulent concealment, yes, they would have had two years to file a petition on the palm print evidence, and if they lost that, then they could have filed a new petition without res judicata on new evidence, that is the DNA evidence. On new evidence, but could have they also then gone back and used the phone logs in combination with the new DNA evidence? That's what I'm asking. If they had done so, yes. I believe they would have been able to do that if they had shown fraudulent concealment and filed the timely petition. Right, right. Okay, thank you. Okay. And so the state is emphasizing the accidental impact of the combination of the converse Q-print evidence as well as the palm print evidence on the pool cue, whereas one piece of evidence in isolation might not have constituted proof beyond reasonable doubt is the combination of those pieces of forensic evidence in combination also with the motive and other relationship evidence that tended to prove the defendant had committed this offense. Now, the shoes had the same style, same width, same size, and of course they were not seized until over a month after the incident, and the defendant also told police that he had thrown a pair away that was worn, but yet the shoes that were actually seized were very worn with missing pieces of rubber, and that's one reason why the wear patterns itself were not an exact match because of the timing and perhaps the defendant could replace them with a different pair of shoes. And then the print on the cue, now it still remains an overwhelming inference that that print was depositing blood. The amount of blood at the crime scene, the fact that there was serology testing on the pool cue itself that confirmed that there was human blood on it, and the uniformity of the appearance of that substance. So the fact that the defense now can get to the stage of saying, well, it cannot be scientifically proved to have been in blood on that exact spot where the rich detail was. True, but that doesn't mean the defense has proved that there's newly discovered evidence that it was something other than blood. It still remains an overwhelming inference that that print was deposited, the rich detail in that was deposited in human blood. And then Dierker, when he charted at trial, 14 characteristics, and they stopped at 14 because this chart would become way too messy if you included all the characteristics you could have identified. And again, they haven't challenged the actual methodology that Dierker arrived at to determine that the printed print from the partial palm print from the cue was consistent with and included the defendant's standard. And that part has not been challenged. And the idea that this was a put-down print versus a takeaway print, in other words, that blood had been on a hand and then deposited onto the item, again, it seems like the defense expert did not really disagree with that part that because the rich detail was left on the item, so therefore the blood must have been on the hand initially, the inference is that it would have been much more likely to have been on the hand initially rather than a takeaway, like if the blood had been on the item before it was touched. But then one of the major points is that the print was near the tip but faced backwards the way a person would have played pool with. And also in combination with the defendant's statements to police that he never used a house cue. So all this in combination, a reasonable trial of fact, we look at this and say, well, if the defendant has at least 14 characteristics on his print facing backwards the way a person would not use if they were playing pool, plus he also told police he never used a house cue, then only way that print, that rich detail, which looks like it was in blood, could have been put on there is if the defendant had committed the offense and, oh, by the way, this is the same person who wore the Conquest Wave Conqueror shoes of the same size, style, and width that left the prints in blood on the floor. And then talking about the financial motive, even though there was cash in the defense pockets and cash in the cash registers, the defendant was the victim's son and he was still able to get money from his mother after the incident. In fact, the amount of activity in the money coming out of the joint bank account increased after the murder and the assets the defendant tried to sell to support his $100-a-day cocaine habit. So all that in combination identified the defendant and it's the fact that they now have a DNA test where they said they cannot find the defendant's DNA on any of the knives. Well, under the Allen and the Golston and Garcia cases, unless there's evidence that the defendant's blood was going to be on those knives in the first place, and notice the defendant had no visible cuts after the murder, so he wouldn't have deposited blood, for example, on the knives. And the assumption of the defendant's DNA expert was that if you're going to be violently stabbing somebody, your hand's going to slide down the knife handle, onto the blade, you're going to cut yourself, and you're going to leave your own blood on the knife handles. But the DNA testing of several of these items, some of it was so low-level or inconclusive it couldn't really find anybody's DNA on them, and the defendant's own DNA expert said he was confounded by that result because that did directly undermine his basic assumption was that an offender in this sort of assault was going to leave their own DNA on the knives. So your argument essentially is that the DNA testing essentially demonstrates that whoever the perpetrator was, they did not leave significant DNA on any of the knives. And that's about all that can be drawn from the lack of the DNA evidence. And then in other instances, there was too much stray DNA unrelated to the victim, unrelated to the defendant. Some of these alleles at these differental locuses because a person only has two alleles at each locus. And then some of these items have, like, four alleles. And so it must have been at least three people, or I think if you combine all the knives up, four people, who had handled the stuff. And you know from 1991, people aren't handling these with, like, gloves and all kinds of precautions. DNA evidence wasn't really being contemplated back then. And when they open up the box at the surgery clerk's office to do the DNA test, they're all just thrown in the box. I mean, it's like there was no real precautions taken here to prevent contamination. And so the defendant's own DNA expert admits that contamination can make these DNA test results a mere distraction. What's our standard of review? Well, it's manifestly erroneous, as we met. And I think the defendant will argue it's abuse of discretion. In his brief, did he not? I don't remember if that's the case. Okay, so then manifestly erroneous, the opposite conclusion is clearly apparent. Is that...? If there's ever a case, this is, like, one of them, yes. Because it's just the confounding and the contamination of the DNA. And another thing, the trial court misconceived this whole point about the Dierker laws and how there had been a test with the victim, William Whelan, and that his palm print was not excluded. It was left inconclusive. Better standards required. And that's just the default. That's the default. And the evidence that Dierker showed, and this has not been rebutted by the defense, is that if the overwhelming evidence was that once there has been an inclusion, a match, to a person here like the defendant, it's a practical impossibility it could be anyone else. And so, like, the Brandon Mayfield case, the AFIS database has 470 million candidate prints in it, and you can probably pick a confusingly candidate print if you can match them by computers. Here, the defendant was pulled in because he was a suspect, because he had converse shoes. And there was converse shoe prints at the scene. That's when his fingerprint and his palm prints were taken. And so that, if it matches him by necessity, it cannot match the victim. They're not going to dig up the victim to get better standards at that point. And so the fact is that the trial court misconceived the importance of the lack of exclusion as to the victim, because there was an unrebutted... It seemed like the trial court was under the impression that the latent print was not suitable for comparison. Am I wrong about that? Not... No, it's not... I believe it was the standard was not suitable. Okay. In other words, if you get 90% of someone's palm print, it's conceivable that there might be some part that might have matched the friend's example. And if you can't 100% exclude it, then you have... My head is expired. Thank you. Thank you. Mr. Schlosser. Good afternoon, Your Honors. May it please the Court. On September 30, 2011, this Honorable Court granted Mr. Whale DNA testing under Section 116.3. In doing so, this Court held, science may not always yield an answer. It is a tool that ought to be used. Only defendants' unyielding persistence brings us to a place in time where there may be an answer. He deserves the opportunity to seek and find the answer. And as this Honorable Court predicted, when that testing was done, modern-day science yielded the exact answers to this case. A private laboratory that was chosen by the state tested the knives that were used to kill the victim and stabbed him 33 times. The state chose that laboratory. And there was DNA on those knives. Not only the knife handle, but on the knife blades. The appellee, Donald Whaley, was excluded from contributing DNA on the weapons used to kill this man. That is incredibly compelling evidence the Honorable Court found. How is that compelling when we know that the defendant had no injuries immediately following the murder to indicate that he had engaged in stabbing someone and would have injuries and have left blood? Yes, Your Honor. So, under the state's theory, this is admittedly, and all parties would admit, this was a brutal crime scene. There were weapons left at the scene. The state has always argued that there was a single perpetrator. That's what was argued to the jury. The state's pattern evidence relating to the footprints said that there was one pattern of shoe prints. So, for this evidence, what it demonstrates is that Mr. Whaley was not that single perpetrator holding the weapons. He's always maintained this evidence. You didn't answer the question, counsel. Yes. If there are no cuts on the defendant, then why should the absence of his blood on the knife be significant? Because his position has always been that he is innocent, that there were no cuts on him because he wasn't involved. He had alibi witnesses to prove that. He testified at trial. Well, let me ask it this way. If there were no cuts on the defendant, what reason would anyone have to believe, assuming he was the guy who committed the crime, that any of his DNA, any of his blood would be on the hip? Well, Your Honor, that assumption is not supported scientifically in this case. Counsel, let me repeat my question. He was found guilty of this offense. You're arguing that a significantly compelling factor in why his conviction should be reversed is that there was his blood, from which DNA could be tested, was not on the knives which were used. What reason is there for anyone to believe, if he himself suffered no cuts or injuries, that his blood should be there? Your Honor, I just want to make sure I'm answering this correctly and not trying to avoid it. But the assumption that's being made is that somebody did this murder in a way where they never injured themselves, even though there were multiple objects used in the murder. And I believe that, under Your Honor's own theory, what it really demonstrates is that it would be a logical thing for a juror at a reach bond to find that Mr. Whelan somehow committed this attack without leaving any DNA or without having a cut or without having any of the evidence that would get true. Well, we're talking about blood in particular, are we not? We're talking about DNA here. Well, it was blood samples from which DNA was tested? Yes, there was DNA. Well, going back to, and this is a point that Ms. Brooks made as well, is it true that the expert testified that there would be an expectation that someone stabbing would cut himself? What the expert testified to, Your Honor, and what I do want to remark on this for, is that Dr. White was unrebutted. The state had no expert. Counsel, please. First thing to do is answer my question. So my question was, is that what he testified to? He testified that given his experience and his review of the documents in this case, that he would have expected that DNA from the assailant had locked on the murder weapons, the knives that were issued. He did testify that way. Was that because he, as Ms. Brooks said, he would have expected that the assailant would have cut himself to leave his blood, or that his DNA would be there because of just handling it? Your Honor, the way, so there are different knives that we're talking about. And on a few of those knives, there was nothing, there was a handle, but there was nothing that would have, if there was a violent stabbing attack, it would have, based on this expert's experience, it would have made common sense for the knife to at least, for the hand to have gone over the blade, at least on top, at some point during this very violent attack. This is an attack that a victim had extensive defensive groups, which is why the forensic evidence here is so violent. This isn't a shooting. This is something where the victim was clearly fighting back in such a way that it would have left a purpose. Let me go back to my question. Is the expert testifying that he would have expected to find DNA from anyone who would have handled the knives, or that he would have expected to find DNA from a blood sample on the knives that he thought the assailant would have left the blood? Dr. Wright testified that he would have expected DNA from the assailant handling the knives, and there was testimony by Colleen Wayman in the underlying evidentiary hearing about the manner in which she cleaned the knives before she left them. So this isn't a situation where DNA from the customers is expected to be on the knives, because Ms. Wayman testified about the three-team process that she used to make sure she was clean before she left that very evening. And so the DNA that the expert expected to find would have been that from the killer. But didn't the doctor, didn't the expert say that he would expect that DNA to be there as a result of the force of the use of the knife and the fact that the offender, likely their hand would have slid down onto the blade? So I think, I just want to make the distinction, we're not talking about I picked up the pen, we're talking about the method in which I used the pen and the motion of my hand in that use. Your Honor, you so much more eloquently explained it. I don't know about that, but I just want to be clear. But that is exactly what Dr. Wright was testifying to. Because of the nature, the violent nature of the stabbing attack, that the assailant certainly would have left his mark forensically. But the assailant didn't. Well, Your Honor, the lower court, there was testimony below that disputes that and ensure contamination is always going to be an issue in an older case like this. And Dr. Wright testified to that. But what you'll see in the allele chart is that there are common alleles that are not unabated between these different knife points. I'm sure there's not a complete composite profile. And there was a lot of litigation that happened below to even force the keyboard search to be conducted with CODA software in this case prior to the 214-1 petition being filed. Well, let's go back to 1991. The knives were swapped at that time, were they not? Yes, Your Honor. And the swabs from the knives, I presume, were retained in some fashion after the trial in 1991? Well, Your Honor, the explorer maintained the evidence in the county courthouse. And at some point, the Illinois State Police, not that police, was brought over. Okay, well, the swabs that were retained, were they then put in a sealed container or a sealed plastic bag of some sort? So, Your Honor, they were originally maintained, proceeded between the time of the crime scene and trial. After trial, the original swabs, my understanding is that they continue to be maintained as part of the evidence in this case. That's right, and then they were eventually submitted to the Morton Crime Lab in what, about 2005 or 2006? Yes, Your Honor. And they were tested at that time? Yes. Okay, and the tests on those swabs at that time, what did they show? Well, none of those tests have ever been linked. Have ever what? None of them have ever been linked to the petition.  The issue in 2011. Have ever been leaked, what do you mean by that? Right, like, the DNA testing and the serology testing has never formed a match to the petition. That he's always been excluded. Well, that wasn't my question. I said, what did they show? I know that they didn't show that defendant's DNA was on any of those swabs that were tested. Did they show anybody else's DNA other than the victim's? There was never a hit to anybody else at that time. And we know those swabs were not contaminated, and we don't know that about the knives. Isn't that a problem for the defense? Well, it's not, Your Honor, because if you look at the lower court's decision, the exclusion, the lower court found that the exclusion of Donald Glaben, by itself, met the standard that was set under Davis and Coleman in 2014 to allow the petitioner to have his trial. So, without an identification of somebody, the court said that the exclusion itself was conclusive, new material evidence that was reasonably, there was a reasonable likelihood of a different probability upon retrial. The exclusion. And that was a sound decision for a number of reasons. And that's because, when you look at this case, holistically, we're in the 21st century now, and people understand, in a way that nobody could predict in 1995, how DNA evidence and how vital that could be in a case like this. And it would be important, upon a retrial, when you look at the DNA, a retrial, a jury would hear, there was DNA found on the knives. And the state could argue that it was contamination, but Dr. Wright testified to below, and the state didn't dispute this in any way, was that contamination doesn't remove somebody's DNA profile from the items of physical evidence. It may add additional evidence. Now, the state didn't take any efforts below to see if anybody who would have handled the knives, from the clerk's office or from ISP or a police officer, they didn't do any of that testing to prove that there was contamination. The record is silent on that. They didn't call a single witness. They didn't request any of that testing. So, in a retrial, a jury would hear, the knives used to kill William Wade, there was DNA, and that excludes Donovan. They would also hear that through all the serology testing in this case, all of that also excludes the petitioner. A jury would hear on retrial that the state has this motive evidence, that the petitioner had a drug addiction around the time of his father's death, and that was his supposed motivation. And the jury would hear that there was more than $1,100 in cash found in the bar, including the victim's pockets. And the jury would also hear on retrial the significant evidence that exists in this case that implicates Mr. McAuley and the murder itself. And that is stuff that did not come in originally, but there is newly discovered evidence, although the court didn't consider it. When Mr. McAuley invoked his stipend in that right over 30 times in response to him committing the murder, the trial court said, I don't need to consider this now. But on retrial, it certainly could become an issue, and this court previously remarked on that very issue in the 2011 case. And I'd like to talk a little bit about that. I'm sorry, can we back up for just a second? I just want to make sure I'm clear. So when the original swabs of the knives were tested, DNA was located? I believe it was that there was DNA located. I don't know if they never performed a hit, and certainly it never was a death on the pole to the defendant. But it was never matched. I'm sorry. Now, it's a large record, and I'm doing my best with this. But what I'd like to talk about a little bit is Mr. Durfner and Lee McAuley, because there was significant evidence that the lower court did here. One of the critical issues in the state's brief that they raised is that somehow the Durfner worksheets, I'll just call them that, these telephone conversations, where he wrote in there that his original comparison was inconclusive to the victim, and that prior to that, he thought that it was marginal in terms of being able to compare to anything else. And there's no dispute here that none of that was disclosed to Mr. Wingler. There's no dispute that he had a discovery request that would have requested information just like this. And from our perspectives, Your Honors, these materials were disclosed as part of the 417 materials that Mr. Wingler received in 2007. And that was during the process where he was trying to obtain DNA testing. That's when these materials were first disclosed. It was part and parcel to his search for DNA testing. And there's certainly, we believe, that this would fall under the diligence and not the popular acceptance standard, because as soon, in 2017, as soon as that testing was complete and analysis was complete, and we went through a content hearing to try to get the DNA run through a CODIS keyboard search, within 90 days of that, Mr. Wayland's entire 214 competition was filed. And under Ortiz, which really discourages peace panel post-conviction litigation, and if, you know, to respond to the opponent, if we were, if Mr. Wayland... I read Ortiz. I don't see that in that opinion. Can you give me the paragraph where it says that? I don't think that Ortiz's court discouraged it. I think he just made a comment in response to the state's argument that if the court ruled in such a way, peace mill litigation would occur. So, yes, Your Honor, and I'm looking at paragraph, well, it's, at the Westlaw version, it's 332 is what I'm looking at. And it really just talks about the state's concern relating to the rest of Utah and part of Oslo. But the issue would be, in 2007, if Mr. Wayland, on his own, litigated just those worksheets, because, again, there's no expert opinions, he doesn't have the ability to depose Mr. Durker and establish all the things that got established here at the evidentiary hearing about the lack of scientific foundation for his opinions and all that. He didn't have any of that. He had two worksheets. If he did that at a loss, the state would be up here today saying, this isn't newly discovered evidence, and it's restricted content. He shouldn't be able to do that. Why ask counsel that question? She said that's not correct. She has to today, because that's what they wrote in their brief. But that is exactly the type of approach that they've taken here, which is to oppose the DNA testing, to oppose the keyboard search. And then when the judge considers all of that, in determining what a retrial would look like and what the result would look like. It seemed to me, when Durker was under examination, that the defense was trying to suggest that the latent print was not suitable for comparison. Was that your suggestion, or am I misreading that? No, Your Honor, you weren't misreading that. His original notes said that it was a marginal print. We knew that it was small size the whole time, but he said it was marginal and a possible palm print. He didn't even know where it came from. And by him saying that it was inconclusive to the victim, the timing is critical, because he found that it was inconclusive and marginal before he was told that there was a suspect. And didn't the trial court say that if it's not suitable, the victim is not suitable for comparison to the defendant? What the trial court said was that... The trial court did not say what I just asked you then? I don't believe it's exactly that way, Your Honor. I believe what the trial court said was that it would cast doubt on the ultimate opinion if the jury had known that this expert originally believed that it was either marginal and separately that it was inconclusive to the victim. So it would cast doubt. If it was inconclusive to the victim, the trial court said... I'm looking at A14 on the trial court's opinion relating to his ultimate opinion. He said it would cast doubt on whether the print could have not been made by anyone except the defendant, as it could have been the victim's, if, as testified to by Durker, a better print was available or a better standard for comparison. But ultimately, Durker concluded that the print belonged to the defendant, right? Well, that was his ultimate opinion. Yes, Your Honor, that was his ultimate opinion. But the print, whether it belongs to the defendant or not, isn't as positive, because what he really proved, though, and what the court found, was that there was no scientific foundation that that print was left in place. And Jenny Tom's testimony is the most critical testimony I've witnessed. And I apologize in advance. I have a question about Triplett's testimony, your witness. Yes, Your Honor. Testified that the latent prints were suitable for comparison, pursuant to a question posed by the state's attorney, the assistant state's attorney, on cross-examination. Do you agree with that? Yes, Your Honor. And then she was asking if she made a comparison, and she said yes. Do you remember that? I remember Jenny... She compared the latent print to the standard from the defendant, correct? I believe that that came out of that question. Yes. And then the prosecutor said, can you tell us for sure whether the latent print excludes Don Whalen? And she responded no. Do you agree that that was her testimony? That's what the record shows. That's what the record shows. Now, my question is, then on redirect examination, defense counsel did not come back with that or challenge it in any way, either her opinion or the fact that she said the latent print was suitable for comparison. Should I draw an inference from that? No, Your Honor, because her report that we got from Ms. Strickland, it specifically did not go into having her make an identification or not make an identification. From our perspective, there were concerns on that issue because of the original court's decision to bar the expert based on kindness. And so because we were hyper-focused on presenting just newly discovered evidence, we had concerns that overlapping, that this would create a residue to codify. Because clearly, Mr. Whalen tried to hire an expert originally. And so Ms. Strickland's opinions were really narrow based on what we believe the newly discovered evidence was. And even outside of that issue, Your Honor, the lack of scientific foundation for the print being left in place, we believe that that was dispossessed. And I'll rest and apologize for that. Thank you, counsel. Any rebuttal, Ms. Brooks? Yes, Your Honor, thank you. I'd like to also start with where I think they started. With this court's prior ruling, this court allowed the defendant's request overruled the trial court's refusal to grant DNA testing on the knives themselves. This court was concerned that despite the possibility of contamination, there would be potential to identify a third person's DNA on there. That is, a true perpetrator could be potentially identified through DNA testing. That is why they got the DNA testing that brings us here to this point today. But that effort was a failure, because there was not a third person identified. So despite that failure, somehow the trial court awarded the new trial. And that's why, if this case was just viewed simply from the fact that, okay, he has DNA testing because of the potential of developing some evidence of innocence, but that effort is a failure, but yet he still gets a new trial anyway, it just doesn't seem like that's... Is that what we said in that case? The citation was to McElvain evidence as potential, because below the defendant attempted to introduce evidence of an alternative suspect. Robert McElvain was dismissed from the bar the night before the murder. The police showed up the next day to talk to him, and he seems to have some, at least deduced some awareness as to why the police are questioning him. Because the owner of the bar, William Whalum, told him to go home the night before, and now the police are showing up early in the morning. So was the argument presented to us eight years ago that maybe the DNA testing would show McElvain's DNA? Without meeting this court's mind, the implication from it was that, well, maybe this DNA will implicate McElvain, because there was an alternative suspect. So let's find out. But yet, Robert McElvain is not having Converse shoe prints. The police took his palm prints, but the defense hasn't shown that it was Robert McElvain's palm prints on the pool cue, or that he had a pair of Converse shoes of the same style, sizing with the ones that left the prints at the scene. So, I mean, if an exoneration innocence project were to represent Robert McElvain, they would probably be sitting here telling a court exactly how guilty Donald Layland is. But yet, and I'm not begrudging them the right to zealously represent their client. That's the way the system works. But to stand up and say that Robert McElvain was the real killer without any ethnicity basis to do so, other than the very thin thing that somehow he told a police officer, and we don't even know how. Did someone call him before and say, hey, I said the police, I told the police your name, they're going to come talk to you? And he says, oh, okay. I thought he said it was about, his response was because of the incident the night before where he was asked to leave or thrown out of the car. Right, right. That was what he said. Right, but we still don't know exactly what was in his mind. So the implication is, oh, well, he must have done it because he knew about the murder before it was publicly announced. I mean, it's very so thin that the LA Supreme Court said that is not enough to admit as evidence of an alternative suspect. That went to LA Supreme Court on direct appeal. Well, actually, all they said was not an abuse of the court's discretion not to lie. Right, but essentially, that evidence is not enough to even admit as alternative suspect evidence to say that Donald Rayland must be innocent because of myocardial methamphetamine and red herring. So, I've entertained other questions. I would like to request this court to reverse outright. Thank you, counsel. We'll take this matter under advisement and be in recess until the next case.